IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF UTAH

| | |
|---|---|
| ANDREW CHATWIN,<br><br>      Plaintiff,<br><br>vs.<br><br>FRED BARLOW, et al.,<br><br>      Defendants. | MEMORANDUM DECISION AND ORDER<br><br>Case No. 2:06-CV-00291DAK<br><br>Judge Dale A. Kimball |

      Defendants Fred Barlow, Jonathan Roundy, and Helaman Barlow request summary judgment as to Plaintiff Andrew Chatwin's 42 U.S.C. § 1983 claims that Defendants violated his rights to freedom of familial association and freedom from bodily restraint.[1]  The court held a hearing on Defendants' Motion for Summary Judgment on February 12, 2008.  At the hearing, David Holdsworth represented Plaintiff Chatwin and Bret Rawson and Peter Stirba represented Defendants.  Following the hearing, the court took the matter under advisement.  Now, having carefully considered the memoranda and additional materials submitted by the parties, as well as

---

[1]  Defendants and the Town of Hildale, Utah, also move for summary judgment on Chatwin's claims of deprivation of property interest; civil conspiracy under 42 U.S.C. § 1983, *see* 42 U.S.C. § 1983 (2003); and constitutional violations by the Hildale municipality.  In his Motion in Opposition to Summary Judgment, Chatwin expressly declines to controvert these claims, and the court grants summary judgment as to these uncontested claims.

1

the relevant law and facts relating to the motion, the court renders the following Memorandum Decision and Order.

## BACKGROUND

The United Effort Plan Trust (UEP) is a religious and charitable trust created to "preserve and advance the religious doctrines and goals of the Fundamentalist Church of Jesus Christ of Latter-Day Saints [the FLDS Church]." The UEP owns most of the property in Hildale, Utah, and the majority of residents in Hildale are members of the FLDS Church. On September 9, 2005, and at all times relevant to this lawsuit, the UEP owned the property located at 660 North Willow Street, Hildale, Utah (the Property).

In spring 2005, the Third Judicial District Court for the State of Utah, addressing a petition by the State of Utah for removal of UEP trustees for breach of trust, designated Bruce Wisan as the special fiduciary for the UEP trust (the Special Fiduciary) and authorized him to administer the trust assets. The state court order empowered the Special Fiduciary to "investigate and take inventory of all [t]rust property" and "to file actions to recover or protect [t]rust property." On September 2, 2005, the state court expanded the Special Fiduciary's authority to administer the trust's property, empowering the Special Fiduciary to "manage, lease, or rent the property of the [t]rust as such action is deemed reasonable, prudent, and/or necessary in the discretion of the [Special] Fiduciary."

On September 9, 2005, Defendant Fred Barlow, a marshal for the city of Hildale, Utah (Officer F. Barlow), received a phone call from the attorney for the Special Fiduciary (the Fiduciary Attorney), informing Officer F. Barlow that Chatwin was attempting to move his belongings onto the Property without permission from the Special Fiduciary. Soon thereafter,

the Hildale Police received a 911 call from Samuel Chatwin, Chatwin's brother, who was currently residing at the Property, informing police that there was an intruder on the Property.

After speaking to the Fiduciary Attorney and receiving the 911 call from Samuel Chatwin reporting an intruder on the Property, Officer F. Barlow, along with Defendants Jonathan Roundy (Officer Roundy) and Helaman Barlow (Officer H. Barlow), both deputy marshals for the Hildale Police, departed for the Property. Defendants arrived at the Property to find two box-trailers, both containing furniture, on trucks parked outside the house. The trailers belonged to Chatwin. Chatwin testified that his primary intent in being at the Property was "to move in," and his secondary intent was to visit his father, Edward Chatwin (Chatwin's Father), who resided in the upstairs portion of the Property. Chatwin also testified that he knew that UEP owned the Property.

After arriving at the Property, Defendants went to an upstairs bedroom where they found Chatwin and Samuel Chatwin, along with several other individuals, including Chatwin's Father. The parties dispute the content of the conversation that proceeded. Defendants contend that Officer F. Barlow asked Chatwin and the other individuals to exit the Property because the Special Fiduciary had prohibited Chatwin from moving onto the Property and because Samuel Chatwin, a resident of the Property, had asked Chatwin, a nonresident of the Property, to leave. Chatwin maintains that although Defendants told him that he needed to leave the Property, they did not explain why he needed to leave.

Chatwin did not comply with Defendants' request that he exit the Property. Chatwin told Defendants that Chatwin's Father had given him permission to stay on the Property. Chatwin claims that he became frustrated and agitated with Defendants' refusal to allow him to visit his

father and that he raised his voice. Defendants, purportedly concerned for their safety and the safety of the Property residents and other individuals on the Property, handcuffed Chatwin. Chatwin denies that he posed a threat to anyone on the Property and asserts that Samuel Chatwin was the only individual upset at Chatwin's presence on the Property. Defendants did not handcuff anyone else on the Property.

After Defendants placed Chatwin in handcuffs, Chatwin presented a letter from his father, stating that Chatwin had his father's permission to move onto the Property. Chatwin admitted that he knew his father did not have legal authority to grant him possession of the Property.

Defendants subsequently brought Chatwin to the front entryway of the Property, and Officers F. Barlow and H. Barlow exited the Property to call the Special Fiduciary to determine whether Chatwin's Father's letter gave Chatwin the right to move onto the Property. Officer Roundy remained in the home with Chatwin. Chatwin was handcuffed for approximately one hour. Chatwin suffered no physical injuries.

Upon speaking to the Fiduciary Attorney about Chatwin's Father's letter, Defendants learned that Chatwin was not permitted to move onto the Property; that no individual claiming a right to UEP property was permitted to use "self-help"; and that persons were only authorized to move onto UEP property after obtaining relief through the appropriate legal channels. The Fiduciary Attorney informed Defendants that he would fax them a notice stating that Chatwin did not have the right to move onto the Property. Officer H. Barlow told the Fiduciary Attorney that "it was imperative that [the attorney] expedite [the fax] because [Defendants] had people in handcuffs" and that Defendants "were [on the Property] to ensure the rights of the citizens of

Hildale, including . . . Chatwin and the UEP." Chatwin continued to be the only handcuffed individual on the Property.

It is disputed when Chatwin learned from Defendants that the Fiduciary Attorney forbade Chatwin from moving onto the Property. The parties also dispute the sequence of events as to Officer Roundy's removal of the handcuffs, but the parties do agree that Officer Roundy, determining that Chatwin had calmed down, removed the handcuffs while Defendants were waiting for the Fiduciary Attorney's fax to arrive. The parties also agree that at some point during the incident, Chatwin's Father specifically asked Chatwin to leave the Property.

A Hildale Police dispatcher brought copies of the Fiduciary Attorney's fax to the Property. In sending the fax, entitled "Notice Re Dispute Concerning Vacated Premises," the Fiduciary Attorney intended to "clarify the position of the Special Fiduciary that all disputes regarding UEP property, including specifically the dispute over [the Property] . . . must be resolved in accordance with the rule of law and legal process." Defendants presented the notice to Chatwin.

Around the same time that Defendants received the fax, Kevin Brooks, a Washington County Sheriff's Deputy (Deputy Brooks), arrived at the scene. Deputy Brooks testified that Chatwin's wife had called the sheriff's office to report that Defendants were harassing her and her husband. When Deputy Brooks arrived he saw Chatwin's wife and approximately fifteen other people standing in front of the Property. Deputy Brooks stated that the scene was being videotaped. As he approached the Property, Deputy Brooks saw Chatwin standing in the front entryway. Deputy Brooks testified that he could hear people yelling from inside the Property. After reviewing the notice from the Fiduciary Attorney and speaking to the Special Fiduciary,

Deputy Brooks concluded that there was no evidence of harassment as alleged by Chatwin's wife.

Chatwin eventually departed the Property, and at some point following the September 9, 2005 incident, the Special Fiduciary authorized Chatwin to take possession of and reside in the Property.

In April 2006, Chatwin filed suit against Defendants, alleging Defendants violated his civil rights under 42 U.S.C. § 1983. *See* 42 U.S.C. § 1983 (2003). Specifically, Chatwin claims that Defendants violated his due process rights in preventing him from visiting his father and in restraining him without justification.

## DISCUSSION

Defendants move for summary judgment on Chatwin's claims for relief under 42 U.S.C. § 1983. *See id*. Defendants contend that they are entitled to qualified immunity because Chatwin fails to demonstrate that Defendants violated his right to familial association and his right to freedom from bodily restraint.

Qualified immunity is an affirmative defense reserved for public officials, such as Officers F. Barlow, H. Barlow, and Roundy. *See Pino v. Higgs*, 75 F.3d 1461, 1467 (10th Cir. 1996). The defense shields from civil liability all public officials "'but the plainly incompetent or those who knowingly violate the law.'" *Medina v. Cram*, 252 F.3d 1124, 1127 (10th Cir. 2001) (quoting *Malley v. Briggs*, 475 U.S. 335, 341 (1986)). The doctrine is designed to "balance the protection of constitutional rights and the 'substantial social costs' of imposing liability on public officials." *Gomes v. Wood*, 451 F.3d 1122, 1134 (10th Cir. 2006) (quoting

*Anderson v. Creighton*, 483 U.S. 635, 638 (1987)).

When a defendant raises the defense on summary judgment, the court applies special rules in determining whether summary judgment is appropriate. *See Reynolds v. Powell*, 370 F.3d 1028, 1030 (10th Cir. 2004). "Specifically, '[t]he plaintiff initially bears a heavy two-part burden [and] must show (1) that the defendant's actions violated a constitutional . . . right, and (2) that the right allegedly violated [was] clearly established at the time of the conduct at issue.'" *Id*. (quoting *Mick v. Brewer*, 76 F.3d 1127, 1134 (10th Cir. 1996)) (alterations in original). "If the plaintiff successfully establishes the violation of a clearly established right, the burden shifts to the defendant, who must prove that there are no genuine issues of material fact and that he or she is entitled to judgment as a matter of law." *Medina*, 252 F.3d at 1128 (quotations and citations omitted); *see also Nelson v. McMullen*, 207 F.3d 1202, 1206 (10th Cir. 2000) ("If, and only if, the plaintiff meets [the] two-part test does a defendant then bear the traditional burden of the movant for summary judgment—showing that there are no genuine issues of material fact and that he or she is entitled to judgment as a matter of law." (quotations and citation omitted)). Thus, "although [the court] review[s] the evidence in the light most favorable to the nonmoving party, the record must clearly demonstrate the plaintiff has satisfied his heavy two-part burden; otherwise, the defendants are entitled to qualified immunity." *Medina*, 252 F.3d at 1128 (citation omitted); s*ee also Eaton v. Meneley*, 379 F.3d 949, 954 (10th Cir. 2004) ("Unless both prongs are satisfied, the defendant will not be required to 'engage in expensive and time consuming preparation to defend the suit on the merits.'" (quoting *Siegert v. Gilley*, 500 U.S. 226, 232 (1991)).

Because a plaintiff's failure to demonstrate that the defendant violated the law defeats

any need for the court to consider whether the law was clearly established, the threshold inquiry for the court is "whether the plaintiff has alleged a deprivation of a constitutional right at all." *Eaton*, 379 F.3d at 954; *see also Simkins v. Bruce*, 406 F.3d 1239, 1241 (10th Cir. 2005) ("If no constitutional right would have been violated were the allegations established, there is no necessity for further inquiries concerning qualified immunity." (quotations and citation omitted)). Here, Chatwin claims that Defendants violated his Fourteenth Amendment substantive rights to familial association and to freedom from bodily restraint. Notably, concerning the latter alleged violation, the Tenth Circuit recently held that an unreasonable bodily restraint claim should be analyzed under the Fourth Amendment when there is an allegation of "inten[t] to acquire physical control." *Clark v. Edmunds*, — F.3d —, 2008 WL 185615 (10th Cir. 2008) (treating plaintiff's claim as a Fourteenth Amendment substantive due process claim where "sheriff only intended to remove [the p]laintiff from his path to the door; he did not intend to acquire physical control over her"). Because Chatwin bases his violation of freedom from bodily restraint claim on Defendants' handcuffing him for approximately one hour—an action clearly intended to assert control over Chatwin—the court examines Chatwin's claim under the Fourth Amendment.[2]

### I. Right of Familial Association

The Tenth Circuit has recognized that the freedom of familial association is a substantive right guaranteed by the due process clause of the Fourteenth Amendment. *See, e.g., J.B. v.*

---

[2] Recognizing the possibility that the court might proceed with a Fourth Amendment rather than a Fourteenth Amendment analysis, the parties briefed the Fourth Amendment issue.

8

*Washington County*, 127 F.3d 919, 927 (10th Cir. 1997); *Griffin v. Strong*, 983 F.2d 1544, 1547 (10th Cir. 1993).  To determine whether a violation of the Fourteenth Amendment due process clause has occurred, the court "balanc[es] liberty interests against the relevant state interests." *Griffin*, 983 F.2d at 1547.  In the instant case, the court balances Chatwin's interest in associating with his father with the state's interest in enforcing judicial orders, in investigating and preventing possible unlawful acts, and in ensuring both public safety and the safety of law enforcement officers.  "Initially, [the court] examine[s] these factors objectively, that is, outside of the facts or subjective positions of the parties." *Id*.  "Nonetheless [the court] do[es] not evaluate constitutional rights in a vacuum." *Id*.  The court's ultimate determination rests on an examination of "the parties' interests in light of the facts of this particular case." *Id*.   The court "weigh[s] these interests to determine whether [Defendants'] conduct in this case constituted an undue burden on . . . [Chatwin's] associational rights." *Id*.

      The court acknowledges the state's interest in the investigation of crimes and the enforcement of its criminal laws; in preserving public safety and the safety of law enforcement officers; and in "enforcing the orders and judgments of [its] courts," *Pennzoil Co. v. Texaco, Inc.*, 481 U.S. 1, 13 (1987).  The court also observes that the right to familial association is viewed as a "very substantial right."  *Griffin*, 983 F.2d at 1548.  "Family relationships by their nature, involve deep attachments and commitments to the necessarily few other individuals with whom one shares not only a special community of thoughts, experiences, and beliefs but also distinctly personal aspects of one's life."  *Id*. (quotations and citations omitted).

      In viewing these interests in light of the facts of the instant case, the court emphasizes that the right of familial association is not unbounded.  *See id*. at 1549.  "Not every statement or

9

act that results in an interference with the rights of intimate association is actionable." *Id.* at 1548. To succeed on a familial association claim, a plaintiff must show that the state actor intended to interfere with the relationship. *See J.B.*, 127 F.3d at 927. That is, the plaintiff must demonstrate that "the defendant . . . *direct*[*ed*] his or her statements or conduct at the intimate relationship with knowledge that the statements or conduct [would] adversely affect that relationship." *Griffin*, 983 F.2d at 1548.

Here, Chatwin claims that Defendants violated his freedom of familial association in barring him from visiting his father, and in forcing Chatwin to leave the Property where Chatwin's Father was residing. In support of his assertion that Defendants acted with the requisite intent of interfering with Chatwin and his father's relationship, Chatwin recites the following facts: that Chatwin's Father was agreeable to having Chatwin visit; that it was Samuel Chatwin, not Chatwin's Father, who objected to Chatwin visiting the Property; that in calling the police, Samuel Chatwin sought to have Defendants interfere in Chatwin's relationship with his father; and that Defendants declined to tell Samuel Chatwin that Chatwin had the right to visit his father.

Defendants contend that Chatwin's asserted facts fail to demonstrate that Defendants acted with the requisite intent to interfere with Chatwin's relationship with his father. Defendants argue that, in contrast to Chatwin's allegations, the undisputed facts show that Defendants acted out of concern for enforcing court orders and preventing self-help and vigilante justice with regard to UEP property; that Defendants acted in accordance with the desires of the Property's residents, one of whom had reported that Chatwin was intruding on the Property, and both of whom had ultimately asked Chatwin to leave the Property; and that Defendants acted on

the reasonable belief that Chatwin was a safety risk to law enforcement, the Property occupants, and other individuals on the Property.

In deciding that Defendants are entitled to qualified immunity as to the alleged violation of familial association, the court emphasizes that Chatwin bears two significant burdens in this case to successfully overcome Defendants' assertion of qualified immunity.  First, Chatwin bears the "*heavy*" burden of showing that Defendants violated a constitutional right.  *Reynolds v. Powell*, 370 F.3d 1028, 1030 (10th Cir. 2004 (emphasis added).  Second, to show that Defendants violated his asserted constitutional right of familial association, Chatwin must demonstrate that Defendants *intended* to interfere with Chatwin's relationship with his father.  The court determines that Chatwin fails to meet either of these burdens.  Chatwin has proffered no evidence demonstrating that Defendants acted with the requisite "willfulness or intent" to adversely interfere with Chatwin's relationship with his father.  *J.B. v. Washington County*, 127 F.3d 919, 927 (10th Cir. 1997).  Accordingly, Defendants are entitled to assert the qualified immunity defense and the court grants summary judgment as to the alleged familial association violation.[3]

## II.   Fourth Amendment Violation

Chatwin also argues that Defendants violated his Fourth Amendment rights when they placed him in handcuffs for approximately one hour.  Under the Fourth Amendment, "[t]he right

---

[3] Because Chatwin cannot demonstrate that Defendants violated his constitutional rights, it is unnecessary for the court to determine whether those rights were clearly established by law. *See Eaton v. Meneley*, 379 F.3d 949, 954 (10th Cir. 2004) ("Unless both prongs are satisfied, the defendant will not be required to 'engage in expensive and time consuming preparation to defend the suit on the merits.'" (quoting *Siegert v. Gilley*, 500 U.S. 226, 232 (1991)).

of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated." U.S. Const. amend. IV. "To determine whether an officer violated the Fourth Amendment, courts must ascertain whether an alleged incident constitutes a seizure and, if so, whether such seizure was unreasonable." *Fuerschbach v. Southwest Airlines Co.*, 439 F.3d 1197, 1202 (10th Cir. 2006).

> "[I]n order to determine whether a particular encounter constitutes a seizure, a court must consider all the circumstances surrounding the encounter to determine whether the police conduct would have communicated to a reasonable person that the person was not free to decline the officers' requests or otherwise terminate the encounter."

*United States v. Little*, 18 F.3d 1499, 1503 (10th Cir. 1994) (alteration in original) (quoting *Florida v. Bostwick*, 501 U.S. 429, 439 (1991)). "Ultimately, a seizure requires either the use of physical force by the police officer or submission by the individual to the police officer's assertion of authority." *United States v. Harris*, 313 F.3d 1228, 1234 (10th Cir. 2002). Placing a suspect in handcuffs generally constitutes physical restraint, causing a reasonable person to feel unfree to leave. *See Hunter v. Buckle Inc.*, 488 F. Supp. 2d 1157, 1174 (D. Kan. 2007).

Typically, an officer must have a warrant or probable cause to lawfully effect a seizure. *See Fuerschbach*, 439 F.3d at 1203. An exception to the warrant or probable cause requirement is an investigative detention, also known as a *Terry* stop. *See id.*; *Oliver v. Woods*, 209 F.3d 1179, 1186 (10th Cir. 2000). During an investigative detention, "'[t]he police can stop and briefly detain a person for investigative purposes if the officer has a reasonable suspicion supported by articulable facts that criminal activity may be afoot, even if the officer lacks probable cause.'" *Oliver*, 209 F.3d at 1186 (additional quotations and citation omitted) (quoting

*United States v. Sokolow*, 490 U.S. 1, 7 (1989)).

In evaluating the legality of an investigative intention, "the inquiry is twofold." *United States v. Neff*, 300 F.3d 1217, 1220 (10th Cir. 2002) (quotations and citations omitted). "First, the officer's action must be justified at its inception." *Id*. (quotations and citations omitted). "For a detention to be valid, the officer must have an articulable suspicion that a detainee has committed or is about to commit a crime." *Gallegos v. City of Colorado Springs*, 114 F.3d 1024, 1028 (10th Cir. 1997).

"Second, the officer's action [must be] reasonably related in scope to the circumstances which justified the interference in the first place." *Neff*, 300 F.3d at 1220 (alteration in original) (quotations and citation omitted). "If a police-citizen encounter exceeds the limits of a *Terry* stop, the detention becomes an arrest that must be supported by probable cause." *Id*. "The allowable scope of an investigative detention cannot be determined by reference to a bright-line rule; 'common sense and ordinary human experience must govern over rigid criteria.'" *Id*. (quoting *United States v. Sharpe*, 470 U.S. 675, 685 (1985)). In determining the permissible scope of an investigative detention, the court does "not engage in 'unrealistic second-guessing' of a police officer's decision." *Id*. (citation omitted). "Thus, a *Terry* stop does not become unreasonable just because police officers use handcuffs on a subject." *Id*.; *see Gallegos*, 114 F.3d at 1030 (explaining that "'intrusive precautionary measures' (such as handcuffs . . . ) during a *Terry* stop do not necessarily turn a lawful *Terry* stop into an arrest under the Fourth Amendment" (citations omitted)). "'Since police officers should not be required to take unnecessary risks in performing their duties, they are authorized to take such steps as [are] reasonably necessary to protect their personal safety and to maintain the status quo during the

13

course of [a *Terry*] stop.'" *Neff*, 300 F.3d at 1220 (alterations in original) (additional quotations and citation omitted) (quoting *United States v. Perdue*, 8 F.3d 1445, 1462 (10th Cir. 1993)); *see also Hunter v. Buckle, Inc.*, 488 F. Supp. 2d 1157, 1175 (D. Kan. 2007) ("The use of handcuffs [in the context of an investigative detention] is appropriate only as long as there is a reasonable, articulable ground for fearing danger from the suspects."). "The hallmark of the Fourth Amendment is reasonableness." *Gallegos*, 114 F.3d at 1030. Thus, "[a]s long as the precautionary measures employed by officers during a *Terry* stop are reasonable, they will be permitted without a showing of probable cause." *Id*. "In determining whether the precautionary measures were reasonable, the standard is objective." *Id*. That is, "'would the facts available to the officer at the moment of the seizure . . . warrant a man of reasonable caution in the belief that the action taken was appropriate.'" *Id*. at 1030-31 (alteration in original) (quoting *United States v. McRae*, 81 F.3d 1528, 1536 (10th Cir. 1996)) (additional quotations and citation omitted).

Here, Chatwin claims that Defendants violated his Fourth Amendment rights in placing him in handcuffs for approximately one hour because there was no criminal activity afoot and he was not acting in an aggressive or threatening manner. In contrast, Defendants first contend that they did in fact have a reasonable, articulable suspicion that Chatwin was committing a criminal trespass in violation of Utah law because, based on the undisputed facts, Chatwin had entered the Property despite a resident's demand to the contrary and UEP owned the Property and had not provided Chatwin with permission to move onto the Property. Based on these facts, Defendants contend that they were justified in conducting an investigative detention of Chatwin. Second, Defendants argue that the detention was reasonably related in scope to the circumstances which justified the interference in the first place because (1) Defendants only handcuffed Chatwin

when he became loud and agitated and Defendants became concerned for their own safety and the safety of the residents and other individuals on the Property; (2) Chatwin was only in handcuffs until Defendants determined that he had sufficiently calmed down enough to no longer pose a threat to the officers and the other individuals at the Property; and (3) Defendants only detained Chatwin until they received notice from the Special Fiduciary reconfirming that, despite Chatwin's letter from his father, Chatwin was not permitted to move onto the Property. Defendants further note that any force in this case was minimal.

The court determines that Chatwin has failed to satisfy his heavy burden of showing Defendants violated his Fourth Amendment rights. To begin, the parties do not dispute, and the court agrees, that the handcuffing and detainment of Chatwin constituted a seizure under the Fourth Amendment. Second, the court concurs with Defendants that they had a reasonable, articulable suspicion to detain Chatwin. The undisputed facts confirm that Samuel Chatwin, a resident of the Property, did not want Chatwin, a nonresident, on the Property and that UEP, the lawful owner of the Property, had not authorized Chatwin to move onto the Property. *See* Utah Code Ann. § 76-6-206 (2003) (defining elements of criminal trespass). Finally, the court agrees with Defendants that, viewed under an objective standard, the detention and the precautionary measures employed by the officers, i.e., placing Chatwin in handcuffs, were reasonable under the circumstances. Specifically, the undisputed facts show that Defendants only detained Chatwin until they received confirmation by fax from the Fiduciary Attorney that, albeit Chatwin's letter from his father stating that Chatwin could move onto the Property, Chatwin did not have permission to move onto the Property. The undisputed facts also show that in calling the Special Fiduciary regarding Chatwin Father's letter, the Defendants conveyed the urgency of immediate

confirmation, stating "it was imperative the [attorney] expedite [the fax] because [they] had people in handcuffs." Additionally, although Chatwin disputes that he acted in a threatening manner, he does not dispute that he was agitated, frustrated, and was speaking in a raised voice and that there were additional individuals on the Property, perhaps as many as fifteen, and that Chatwin and Samuel Chatwin had forceful physical contact with one another on the Property. Accordingly, because the court concludes that Defendants did not violate Chatwin's Fouth Amendment rights, Defendants are entitled to qualified immunity and summary judgment is appropriate.[4]

## CONCLUSION

Defendants' Motion for Summary Judgment is GRANTED. The court orders each party to bear their own costs.

DATED this 20th day of February, 2008.

BY THE COURT:

_Dale A. Kimball_

DALE A. KIMBALL
United States District Judge

---

[4] Again, because Chatwin fails to show a constitutional violation, the court does not address the second prong of the qualified immunity inquiry. *See Eaton*, 379 F.3d at 954.